AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

```
LODGED
CLERK, U.S. DISTRICT COURT
08/28/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ____DM____ DEPUTY
```

```
FILED
CLERK, U.S. DISTRICT COURT
8/28/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: _____DL_____ DEPUTY
```

United States of America

v.

MARK FITTING,
MELONY ERICE,
GEORGE POSEY IV, and
DEAN MIRABAL,

Defendants

8:20-mj-00591

Case No.   ~~2:20-mj-04110~~

# CRIMINAL COMPLAINT BY TELEPHONE
# OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 8, 2018, in the county of Orange in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 641, 2(a) | Theft of Government Property; Aiding and Abetting |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
*Complainant's signature*

Marc Nelson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   08/28/2020

*Judge's signature*

City and state:   Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Marc Nelson, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrants against MARK FITTING ("FITTING"), MELONY ERICE ("ERICE"), GEORGE POSEY IV ("POSEY IV"), and DEAN MIRABAL ("MIRABAL") for a violation of Title 18, United States Code, Sections 641, 2(a) (Theft of Government Property; Aiding and Abetting).

2.   This affidavit is also made in support of an application for a warrant to search 1542 Monrovia Avenue, Newport Beach, CA 92663 ("SUBJECT PREMISES 1") as described more fully in Attachment A-1 and 442 E. Bay St., Costa Mesa, CA 92627 ("SUBJECT PREMISES 2") as described more fully in Attachment A-2.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 641 (Theft of Government Property), 1832 (Theft of Trade Secrets), and 1343 (Wire Fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient

probable cause for the requested complaint and warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   BACKGROUND OF AFFIANT

5.   I am a Special Agent with the United States Department of Defense ("DOD"), Office of the Inspector General ("OIG"), Defense Criminal Investigative Service ("DCIS"), in Valencia, California, and have been so employed since April 2019.  Prior to my employment at DCIS, I worked as a Special Agent for the Office of Personnel Management, OIG for approximately five years, and as a Senior Investigator with the United States Department of Labor, Employee Benefits Security Administration. I am a graduate of the Criminal Investigator Training Program and the Inspector General Academy at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received specialized training in the investigation of various financial and white collar crimes and I have personally conducted or assisted in the investigation of violations of U.S. law to include conspiracy, theft, mail fraud, wire fraud, health care fraud, and identity theft.  In addition, I have received both formal and informal training regarding computer-related investigations and computer technology.

## III.   SUMMARY OF PROBABLE CAUSE

6.   Through his employment with the United States Government, U.S. Navy civilian engineer FITTING accessed and

downloaded government-controlled technical drawings and manuals
that he subsequently sold to Newport Aeronautical Sales
Corporation ("NASC"), an international supplier of aerospace
technical data, located in Newport Beach, California, through
ERICE, a former cohabitant.  NASC then sold the stolen
government-controlled technical manuals and drawings to various
customers in and outside of the United States.  NASC has
purchased stolen government-controlled technical drawings and
manuals from FITTING and/or ERICE since at least 2012, but may
have been acquiring such stolen government-controlled technical
drawings and manuals from FITTING and/or ERICE since
approximately 2008.  Within NASC, MIRABAL is responsible for
submitting inquiries to ERICE and for the subsequent sale of
stolen government-controlled technical manuals and/or drawings.
POSEY IV communicates with ERICE with respect to payments for
the stolen government-controlled technical drawings and manuals
and obtaining credit for cancelled orders.  Based on our
investigation, agents believe MIRABAL and POSEY IV are aware of
the appropriate processes to procure government-controlled
technical manuals and drawings and, as a result, they know that
the acquisition of such manuals and drawings from ERICE and/or
FITTING is unlawful.  Agents also believe that NASC employees,
including MIRABAL and POSEY IV, may be unlawfully obtaining
government-controlled technical manuals from additional sources.

        7.    In one such instance, on December 8, 2018, at the
request of MIRABAL, FITTING accessed and downloaded a
government-controlled technical drawing for a military landing

craft air cushion that he and ERICE sold to NASC, along with at
least 16 other government-controlled technical drawings and/or
manuals, for $5,025.  Knowing the drawing was unlawfully
procured outside of official government channels, POSEY IV paid
ERICE for the drawing.  NASC sold the drawing to a customer for
$325.

8.    As described herein, NASC conducts business at SUBJECT
PREMISES 1, where recent surveillance confirms MIRABAL continues
to operate.  POSEY IV also conducts NASC business from his
residence, SUBJECT PREMISES 2.  There is probable cause to
believe that evidence, fruits, and instrumentalities of the
Subject Offenses will be found within both locations.

### IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    FITTING Emails Government-Controlled Technical
       Drawings and Manuals to ERICE's Gmail Account**

9.    Based on my review of DOD employee records, I know
that FITTING is a General Schedule, Grade 13  ("GS-13"), Step
10, classified civilian federal employee.  FITTING is employed
by the U.S. Navy in Philadelphia, Pennsylvania, and resides in
Berlin, New Jersey.

10.   Based on my investigation in this case and information
I have received from U.S. Navy information technology employees,
I am aware that the Navy has issued FITTING an account to access
a U.S. Government Information System for authorized purposes as
part of his employment.  The account includes an email address
-- mark.fitting@navy.mil.  The Navy also issued FITTING a
computer to access the information system.  Prior to receiving

account access, FITTING was required to acknowledge the
limitations on the use of the account for authorized purposes
only and that the account is subject to routine monitoring.
Each time he logs in to his account, FITTING is required to
enter user-specific login information and acknowledge a warning
banner.  The warning banner advises that the information system
is provided for authorized use only and that users consent to
routine intercept and monitoring for purposes including, but not
limited to, personnel misconduct and law enforcement
investigations.  It further advises that the government may
inspect and seize data stored on the information system at any
time.  FITTING is unable to access his computer without logging
in to the information system.  I am also aware that to maintain
his account access, FITTING is required to complete annual
training requirements that address the use of government data,
misuse of government computer systems, and counterintelligence
vulnerabilities.

11.  I am aware that agents from the DCIS and the NCIS
accessed FITTING's information system account and emails to
investigate a claim that FITTING was interfering with the
quality assurance process for aircraft canopies intended for use
in U.S. military aircraft.  While conducting this review, the
agents found at least 24 emails that were sent from FITTING's
Navy email account to melonyerice@gmail.com ("ERICE's Gmail
account") from March 6, 2019, to May 9, 2019.  All of the emails
had digital files containing government-controlled technical
drawings or manuals related to various military weapons systems,

including aircraft, attached.  Based on my review of these attachments, I know that some of those drawings and manuals were specifically labeled with International Traffic in Arms Regulations ("ITAR")[1] distribution warnings related to export control and destruction, as well as DOD contractor proprietary markings.

12.  Agents reviewed the metadata for the digital files attached to the emails FITTING sent to ERICE's Gmail account and learned that at least 13 of the drawings were downloaded electronically from the DOD's Joint Engineering Data Management Information and Control System ("JEDMICS").[2]  Agents also located an email from FITTING to the Naval Supply Systems Command Weapon Systems Support Security Office, dated January 30, 2019, in which he requested to renew his access to JEDMICS.  Based on my review of the metadata, my knowledge of FITTING's access to JEDMICS, and FITTING's use of his Navy email to send the drawings and manuals, I believe that FITTING used his access to

---

[1] The U.S. Department of State, Directorate of Defense Trade Controls ("DDTC") is charged with controlling the export and temporary import of defense articles and defense services covered by the United States Munitions List ("USML") and promulgated the ITAR, Title 22, Code of Federal Regulations, Parts 120-130, to implement the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778.  The USML is included in the ITAR at 22 C.F.R. § 121.1.

[2] Based on internet queries, I know that JEDMICs is a digital repository for approved DOD engineering drawings that permits access to technical drawings through the internet with an authorized account and password.  Account applicants are required to submit an access request form for the purpose of validating the trustworthiness of individuals requesting access to DOD systems and information.

a U.S. Government Information System to unlawfully obtain copies of government-controlled technical drawings and manuals.

13.   I reviewed a System Authorization Access Request ("SAAR") that was signed by FITTING for Air Force JEDMICS access.  The following information was included in the SAAR:

a.   I accept full responsibility for the protection and destruction of limited (proprietary), and distribution of, controlled data. I will safeguard the data to the degree that it shall not be released outside the government nor be used, released or reproduced in whole or in part for any reason except where permitted by contract (18 USC 1905 and DOD 5400.7-R AFSUP1).

14.   I reviewed Google account subscriber records for the email address melonyerice@gmail.com and learned that the name of the account holder is ERICE and the recovery email address is m.erice@daher.com.  Based on my review of public information databases and bank records, I know that ERICE is employed by Daher-Socata, a French company that produces general aviation aircraft, and currently resides in Lighthouse Point, Florida.  I also know that ERICE previously cohabitated with FITTING in Berlin, New Jersey, beginning in approximately June 2006.

15.   Based on my investigation in this case, I do not believe that FITTING was lawfully authorized to send ERICE any of these government-controlled technical drawings or manuals, or any of the government-controlled technical drawings or manuals discussed further below.  Further, I believe that FITTING's accessing, downloading, and sending these government-controlled

technical drawings and manuals to ERICE constitutes a theft of government property.

**B.    The Same IP Address Accesses FITTING and ERICE's Gmail Accounts**

16.   During the review of FITTING's U.S. Navy account described above, agents found an email from markfitting@gmail.com ("FITTING's Gmail account") to FITTING's U.S. Navy email account on April 23, 2019.  I reviewed subscriber information for FITTING's Gmail account, which lists FITTING as the account holder and the recovery email address as FITTING's Navy email account, mark.fitting@navy.mil.

17.   I reviewed Internet Protocol ("IP") connection logs for the Gmail accounts belonging to FITTING and ERICE for the period of December 2018 to August 2019.  The connection logs listed the IP addresses[3] that were used to access the accounts during the period of review.  From approximately December 20, 2018, through approximately August 23, 2019, the IP address 96.248.93.35 was regularly used to access FITTING's Gmail

---

[3] An IP address is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Many companies control a range or a block of IP addresses.  A single IP address can manage Internet traffic for more than one computer or device, such as when a router in one's home routes traffic to one's desktop computer, as well as one's tablet or smartphone, while all using the same IP address to access the Internet.  A newer system used by some computers or networks, referred to as IP version 6, serves the same function and uses a longer value that is a combination of numbers and letters (allowing for more addresses).

account.  I queried that IP address using iplocation.com[4] and
learned that the IP address geolocates to Berlin, New Jersey.  I
also noticed that the same IP address, 96.248.93.35, was
frequently used to access ERICE's Gmail account.  Agents
obtained subscriber records from Verizon and learned that the IP
address 96.248.93.35 is associated with FITTING's Verizon
account and the customer address is FITTING's residence in
Berlin, New Jersey.

18.  Based on this information, I believe that FITTING
unlawfully sends government-controlled technical drawings and
manuals accessed through his employment with the Navy to ERICE's
Gmail account, then accesses those drawings and manuals through
ERICE's Gmail account.  As described further below, I also
believe that FITTING and ERICE sell the government-controlled
technical drawings and manuals to NASC.

**C.   NASC Issued Checks to ERICE Totaling $509,845**

19.  Based on internet queries, I know that NASC is a
corporation based in Newport Beach, California.  NASC markets
itself as the largest independent supplier of aerospace
technical data and solicits technical manuals and drawings for
aircraft.  Specifically, NASC's website, newportaero.com[5],
states, "From legacy aircraft to latest revision; Newport is
always looking to expand its capabilities.  Do you have
technical data or a technical library that Newport might be

---

[4] Iplocation.com is an online service that provides a
geographical location and organization association for any IP
address.

[5] Last accessed August 7, 2020.

interested in?  Please send us an email at sales@newportaero.com
to discuss how we can work together."

20.  I reviewed records for a Bank of America account
ending 7869 held in ERICE's name at ERICE's residence in
Lighthouse Point, Florida.  The account was previously held in
ERICE's name at FITTING's residence in Berlin, New Jersey.  I
also reviewed Union Bank and Chase Bank records for NASC.[6]
Between September 21, 2012, and June 20, 2019, NASC issued ERICE
approximately 150 checks, totaling approximately $509,845.  Most
of the checks that were issued to ERICE by NASC appear to have
been deposited into the Bank of America account ending 7869 at
Bank of America ATMs located in Berlin, New Jersey.  During the
time period reviewed, the first check issued by NASC to ERICE
was on September 21, 2012, and deposited on October 22, 2012.

**D.   FITTING and ERICE Split the NASC Proceeds**

21.  I obtained and reviewed surveillance video for several
of the ATM transactions that took place in Berlin, New Jersey.
On at least four occasions, FITTING can be seen depositing an
NASC check into the Bank of America account ending 7869 held in
ERICE's name.  Further, on at least one occasion, FITTING can be
seen withdrawing cash from the Bank of America account ending
7869 at an ATM in Newhall, California, on August 7, 2019, then
depositing cash into a Bank of America account ending 7196 held
in FITTING's name minutes later.

---

[6] Union Bank and Chase Bank records list the address of
record for the accounts as SUBJECT PREMISES 1.

22.   I reviewed Chase Bank records for a Chase Ink Business credit card account ending 3759 held in the name of FITTING at FITTING's address in Berlin, New Jersey, for the period of August 2014 to August 2019.   ERICE is listed as an authorized card holder on the account with a credit card ending with 1231. From approximately August 2014 to July 2019, I observed that ERICE's card was used to make purchases totaling approximately $55,171.17.   During that same period, FITTING's card was used to make purchases totaling only approximately $4,625.93.   For the entire time the account was active, the records indicate that FITTING made the monthly payments.   In particular, for the period of November 2016 to August 2019, monthly payments to the account were made from a Truist Bank -- at the time Branch Banking and Trust Company (BB&T) -- account registered to FITTING at FITTING's address in Berlin, New Jersey.

23.   Bank records reflect that this arrangement began earlier than November 2016, however.   For example, ERICE made purchases of $1,599.98 on the Chase Ink Business credit card during the billing cycle of April 12, 2015, through May 11, 2015.   One of those purchases was made at "EF Tire & Auto Repair," in Pompano Beach, Florida, on April 16, 2015, in the amount of $1,118.30.   FITTING did not use his credit card to make any purchases during that billing cycle.   On June 1, 2015, FITTING's Susquehanna bank account -- a predecessor to his Truist Bank account -- was used to make a payment for the statement balance of $1,599.98.

   **E.   FITTING and ERICE Discuss Splitting the NASC Proceeds**

24.   On October 10, 2019, the Honorable Frederick F. Mumm, United States Magistrate Judge, Central District of California, authorized a warrant for information associated with FITTING and ERICE's Gmail accounts in case number 2:19-MJ-04310 (the "Gmail warrant").

25.   During my review of the information obtained pursuant to the Gmail warrant, I found an email dated April 12, 2015, sent from ERICE's Gmail account to ERICE's Gmail account (same email address as sender) in which FITTING and ERICE discussed their sale of government-controlled technical drawings and manuals to NASC.  Specifically, the email read:

> Mark, This is what I got from the dates listed above. I didn't gamble in January or February of 2015. Thank goodness I am nipping this in the bud.  Maybe this was a good idea, seeing the amounts on paper. Yes I did waste a lot of money but it could have been way worse.  Between the money that I wasted gambling and buying pills I could have a brand new car. Aside from all of that I feel terrible but Mark I am sorry to say I must let this go from my mind so I don't dwell on it.  Instead I am going to try to concentrate on more positive things…
> From March 2015 thru April 2015.
> $1942.50 Total from dates of 3/9, 3/11, 3/16, 3/19, 4/2, 4/6, 4/8, and 4/9.
> This includes all cash withdrawals from my account as well as withdrawals from transfers.
> All fees and overdraft charges incurred due to poor account management and direct withdrawals from casino ATMs.
> Moneys deposited in NJ account by you…$7300.00 of which $1825.00 was my portion.
> Total deposited this year by you $11610.00.
> As bad as this is, it could have been way worse. You are 100% correct I would have my own saved money to fix the car.  At least I am working to fix things and get myself back under control.
> I know it is wrong to move monies around without discussing it with you first and I won't do it anymore.  Now as far as the credit card goes…I would like you to print from Chase not your spread sheet monthly credit balance since 2012.  Those monthly balances will be used against deposits made and even

adding in FPL credit card…you are going to come out extremely close to even if not in your favor.  But all of that is fine.  Please lets not fight over this due to selfishness, we are smarter than that, This has benefitted us both very well over these last 7 years. Lets not be foolish by making important decisions on high emotions.  I know you want best for me but me at 25% and you at 75% is way better than both at 0.00%. My portion of the process is just important as your portion that's what a team is…together working together for one common goal.  It's not my fault my portion doesn't take the amount of physical time that yours does but that is why you get 75%.  I have always trusted you and continue to trust you.  George is my friend and will do what ever I tell him to do.  Lets just move forward and put past in the past.  I can't move forward if I continue to dwell on the past.  I thank you for everything that you do for me and I love you for it.  Finally as I sit here writing this I can honestly say this is the clearest my mind has been in weeks from kicking opiates and having pneumonia and all of those meds, my guilt and terrible self destructiveness.  I am going to work hard again to be more of the person that I want to be, a better mother, daughter, sister, worker, friend and person in general.  I will try to gain some better coping skills.  Unfortunately it is difficult to talk to you or anyone because people see me as weak and a failure. No more of that…but this has been my pattern.

Call me later.  I am in and out no necessarily with phone on me every minute so don't freak if I don't answer.  Joshua is coming by this afternoon.

Love ya, M

a.    Based on my review of the email, I believe that FITTING and ERICE both access and use ERICE's Gmail account.  I believe ERICE's statement about her friend "George," was a reference to NASC's President and CEO, George Posey III ("Posey III").  And I believe the discussion regarding finances is related to the sharing of the proceeds received from NASC whereby FITTING receives approximately 75% of the proceeds and ERICE receives the remaining 25%.  Because ERICE has a connection to NASC ("George is my friend and will do what ever I

tell him to do") and is presented as the seller of the drawings
and manuals to NASC (e.g., emails are sent to and from her Gmail
account and payment is issued in her name), I believe that
FITTING provides her with 25% of the proceeds ("me [ERICE] at
25%") even though he is the one who accesses the government-
controlled technical drawings and manuals and sends them to NASC
("my [ERICE's] portion doesn't take the amount of physical time
that yours [FITTING's] does but that is why you get 75%").

26.  During the review of ERICE's Bank of America account
records discussed above, agents observed three NASC checks
payable to ERICE totaling $7,300 were deposited during the
period of March 5, 2015, through April 6, 2015.  Agents believe
that ERICE referenced these deposits in her email, noting that
FITTING made the deposits ("Moneys deposited in NJ account by
you…$7300.00"), and discussed their agreement to split the
proceeds ("of which $1825.00 was my portion").  This split was
consistent with the agreement to split proceeds discussed above
-- $1,825 is 25% of $7,300.

**F.    Identification of MIRABAL and POSEY IV**

27.  Based on my review of California Employment
Development Department ("EDD") records, I am aware that NASC
employees three individuals: Posey III, POSEY IV, and MIRABAL.

28.  During a review of the information obtained pursuant
to the Gmail warrant, agents discovered thousands of emails
between ERICE's Gmail account and email accounts associated with
NASC, in particular MIRABAL and POSEY IV, discussing the
availability and sale of government-controlled technical manuals

and drawings.  On February 10, 2020, the Honorable Jacqueline Chooljian, United States Magistrate Judge, Central District of California, authorized a warrant for information associated with five NASC email accounts, including accounts used by MIRABAL and POSEY IV, in case number 2:20-MJ-00590 (the "NASC email warrant").

29.  Agents identified MIRABAL as the user of the email address dean@newportaero.com (the "MIRABAL email account"). Based on my review of EDD records, I am aware that MIRABAL has been employed by NASC since at least March 2010.  Based on my review of California Department of Motor Vehicles ("DMV") records and surveillance performed pursuant to this investigation, I am aware that MIRABAL resides at 2912 Peppertree Ln., Apt. C, Costa Mesa, CA 92626.  On February 16, 2017, MIRABAL sent an e-mail from dean@newportaero.com and said the following: "This is Dean Mirabal and here are the noise my dryer is still making after your guy can (sic) and fixed it. Please let me know what needs to be done to fix the noise…2912 PEPPERTREE LANE APT#C COSTA MESA, CA. 92626…"  During the review of e-mails, agents did not identify anyone other than MIRABAL that appeared to use dean@newportaero.com.  Based on my review of emails obtained pursuant to the NASC email warrant, and as discussed further below, I believe that MIRABAL handles day-to-day customer requests and is responsible for inquiries to ERICE and others regarding the acquisition and subsequent sale of stolen government-controlled technical manuals and/or drawings obtained from ERICE and others.

30.   Agents identified POSEY IV as the user of the email address mac@newportaero.com (the "POSEY IV email account"). Based on my review of EDD records, I am aware that POSEY IV has been employed by NASC since at least March of 2010.  Based on my review of DMV records and surveillance performed pursuant to this investigation, I am aware that POSEY IV resides at 442 E. Bay St., Costa Mesa, CA 92627 (SUBJECT PREMISES 2).  POSEY IV is also the son of NASC's President, Posey III.  On July 11, 2017, POSEY IV sent an e-mail from mac@newportaero.com with a subject line "RE: 442 E Bay", the e-mail contained two pay stubs for POSEY IV from NASC.  One pay stub was dated May 26, 2017, and the other pay stub was dated June 9, 2017.  The e-mail appears to be related to POSEY IV obtaining a loan to purchase SUBJECT PREMISES 2.  During the review of e-mails, agents did not identify anyone other than POSEY IV that appeared to use mac@newportaero.com.  Based on my review of emails obtained pursuant to the NASC email warrant, I believe that POSEY IV deals with ERICE and/or FITTING with respect to payments for stolen government-controlled technical drawings and manuals and for obtaining credit for cancelled orders.

31.   For example, POSEY IV sent an email to ERICE's Gmail account on January 12, 2017, writing, "Melony, We switched banks. Couple of checks are on their way out.  Future checks will be sent on schedule per our 3 invoice agreement. Just wanted to give you a heads up…"

32.   Similarly, on October 6, 2016, POSEY IV sent an email to ERICE's Gmail account, writing, "Melony, Hope all is well.

Wanted to touch base about future availability. Do you foresee yourself having the same availability on drawings for the coming future? Let's say the next 5+ years? Thanks, we appreciate your support."

33. On March 12, 2018, POSEY IV sent an email to ERICE's Gmail account, writing, "Melony, I noticed you have a couple of checks you have not cashed. Is there a better address for me to send them to? Also wanted to see what your outlook is for the next 5-10 years. Do you see any changes in your availability to drawings?"

34. On March 14, 2018 ERICE and/or FITTING replied to POSEY IV: "Mac, I don't see any changes. However, I may have to raise my prices if you continue to request drawings and then not place the orders."

> **G.  MIRABAL and POSEY IV are Aware of the Appropriate Processes to Procure Government-Controlled Technical Drawings and Manuals**

35. During my review of their respective emails, I discovered emails in which MIRABAL and POSEY IV inquired about the availability of government-controlled technical drawings and manuals from the Naval Air Technical Data and Engineering Service Command ("NATEC").  Specifically, on March 20, 2018, MIRABAL emailed a Logistic Management Specialist at NATEC and said, "Meliza, Checking availability. NAVIST 13120.1D…Respectfully, Dean Mirabal".  On March 21, 2018, a Logistic Management Specialist at NATEC replied to MIRABAL writing, "Hi Dean, NAVINST 13120.1D – This manual is not releasable under QCP program.  Denied by the controlling

activity…"   On June 9, 2016, POSEY IV emailed a Logistic
Management Specialist at NATEC, writing, "Meliza, Please order
this one: A1-T6AAA-2…"   On June 29, 2016, he wrote, "Meliza,
Following up on the below: (referencing the June 9, 2016
email)".   On June 30, 2016, a Logistic Management Specialist at
NATEC replied, "Mac, This has been denied by the controlling
activity."

36.   I also reviewed emails in which POSEY IV inquired
about the availability of technical manuals and/or drawings from
the U.S. Air Force.   Specifically, on August 11, 2014, POSEY IV
received an email from the Air Force Public Sales Office which
read, "Mr. Posey, If you wish to request the following data then
you will be required to follow the instructions that I have
provided for you…Please be specific on your intended use.   We
ask that you provide a contract number or solicitation number or
some kind of verifiable proof documentation/information and or
agreement before we release data…"

37.   Further, on March 9, 2016, POSEY IV replied to a
potential customer, who was inquiring about the availability of
a drawing, writing: "Elmo, They are worth a shot.   The AF won't
release anything to us without a contract and as we never get
contracts I no longer have any POCs.   Here is their website,
their help desk or 1800 number have been helpful in the
past....http://www.tinker.af.mil"

38.   I also reviewed emails where POSEY IV makes Freedom of
Information Act ("FOIA") requests for NAVAIR publications.
Based on my review, NATEC has denied some of NASC's requests

based on the "controlling activity" -- a reference to the DOD entity with responsibility for the applicable technical drawing or manual -- and the FOIA requests appear to take years to process.

39.   Based on my review of the emails discussed above, and my investigation in this case, I believe that POSEY IV and MIRABAL are aware of the proper procedures to acquire government-controlled technical drawings and manuals.

40.   Further, HSI and DCIS agents interviewed Posey III and POSEY IV in June 2018 pursuant to a separate investigation. Agents identified themselves to Posey III and POSEY IV, and conducted a Project Shield America ("PSA") briefing and an interview.[7]  The PSA and interview were conducted in Posey III's office located inside of NASC (SUBJECT PREMISES 1).  During the interview, Posey III and POSEY IV provided a list of their sources for technical manuals and drawings, including certain individuals and companies, FOIA requests, direct sales from the DOD, and from government surplus.  Posey III and POSEY IV did not identify ERICE or FITTING as a source of technical drawings or manuals for NASC.

> **H.    FITTING and ERICE Sell Government-Controlled Technical Drawings and Manuals to NASC**

---

[7] PSA is an industry outreach and source development initiative developed by HSI to prevent the illegal export of sensitive U.S. munitions and strategic technology to terrorists, criminal organizations, and foreign adversaries.  PSA is an integral part of the HSI strategy to combat the trafficking of Weapons of Mass Destruction and their components as well as the trafficking of conventional weapons and controlled technology. The initiative includes visiting manufacturers, distributors, exporters, and freight forwarders in an effort to educate them and to solicit their support in export compliance.

       1.   <u>September 2015 Sale</u>

     41.  On January 19, 2016, ERICE's Gmail account sent an email to Posey III's email (george@newportaero.com), which included an attached invoice from "M&M Associates" -- presumably for <u>MARK FITTING</u> and <u>MELONY ERICE</u>.  The invoice, dated October 12, 2015, listed FITTING's residential address in Berlin, New Jersey, as the business address.  The invoice identified fifteen technical drawings and/or manuals that "M&M Associates" sold to NASC, including: PWA 79345, NAS 1193, NAS 509, 70103-11007, 70103-11009, 695813, 70307-03007, 65368, and 128SHC142.  The invoice listed the number of pages and cost per drawing, as well as a total amount of $1,400.  According to the invoice, the drawings were sent to NASC via FedEx, with tracking number 805484469376.

     42.  I reviewed bank records for accounts belonging to NASC and ERICE and discovered that NASC issued a check to ERICE on January 19, 2016, in the amount of $1,400.  The check was deposited into ERICE's Bank of America account on March 4, 2016.

     43.  Agents identified an inquiry from an NASC customer[8] to MIRABAL on September 28, 2015, requesting certain technical drawings and manuals, including PWA 79345-4, NAS 1193E6C, NAS 1193K6C, NAS 509-6, NAS 509L6, 70103-11007, 70103-11008, and 70103-11009.

---

[8] Based on my review of the e-mails, I believe that the sender is a customer of NASC that is based in Melville, NY, because the name of the company in the e-mail is the same company name in an invoice, discussed further below, showing the company purchased the drawings from NASC.

44.   On September 28, 2015, MIRABAL emailed ERICE to check the availability of PWA 79345-4, NAS 1193E6C, NAS 1193K6C, NAS 509-6, NAS 509L6, 70103-11007, 70103-11008, and 70103-11009.

45.   On October 4, 2015, ERICE emailed MIRABAL: "Dean, Drawings PWA 79345-4, NAS 1193E6C, NAS 1193K6C, NAS 509-6, NAS 509L6, 70103-11007, and 70103-11009 are available. Please send confirmation and I will order them…Drawings PWA79345-4, 70103-11007, and 70103-11009 are marked "Export Controlled". NAS 1193 lists part numbers NAS1193E6C and NAS 1193K6C…NAS509 lists part numbers NAS509-6 and NAS509L6…Drawing 70103-11008 is marked "Limited Rights" so I can't get it."

46.   On October 5, 2015, MIRABAL emailed the NASC customer: "Drawings PWA79345-4, 70103-11007, and 70103-11009 are available, each priced at $325... NAS 1193 lists part numbers NAS1193E6C and NAS 1193K6C…NAS509 lists part numbers NAS509-6 and NAS509L6.

47.   That same day, MIRABAL emailed ERICE: "Melony, Please send me all 7 of these ones."

48.   Agents identified a NASC invoice dated October 15, 2015, attached to an e-mail sent from MIRABAL to the NASC customer that was inquiring about the drawings.  The invoice lists the following drawings: PWA 79345, NAS 1193, NAS 509, 70103-11007, 70103-11009, 695813, 70307-03007, 65368, and 128SHC142, all priced at $325 each.  The invoice indicates a total of $2,925, which was paid by a VISA on October 15, 2015.

2.   December 2018 Sale

49.   On November 30, 2018, another NASC customer[9] emailed
MIRABAL requesting Navy drawing 5749831-007.  The e-mail subject
line read: "Navy drawing, 5749831-007, Wire Rope Assy, NSN 4101-
01-317-6375".  The body of the e-mail read, in part: "Hello
again Dean…Please order the above drawing for us and bill to our
Visa on file…Thank you!"

50.   On November 30, 2018, MIRABAL emailed ERICE's Gmail
account: "Melony, Checking availability… Navy drawing, 5749831-
007, Wire Rope Assy, NSN 4101-01-317-6375".

51.   On December 7, 2018, MIRABAL emailed ERICE's Gmail
account, following up on his request from November 30, 2018:
"Melony, Any luck on this one."

52.   Agents reviewed a SAAR for FITTING's access to the
U.S. Navy JEDMICS, and are aware that FITTING was assigned User
ID "NAVSD00127".  Agents also reviewed an Excel spreadsheet
containing Navy JEDMICS download activity for User ID
"NAVSD00127".  Based on my review of FITTING's Navy JEDMICS
activity, I am aware that on December 8, 2018, FITTING accessed
drawing number 5749831 from JEDMICS.  Agents reviewed drawing
number 5749831, which appears to be a specification control
drawing related to a landing craft air cushion, cable assembly
ramp system.  The drawing is marked with Distribution Statement
D: "Distribution authorized to DoD and DoD Contractors only;

---

[9] Based on my review of the e-mails, I believe that the
sender of the email is a customer of NASC based in Torrance, CA,
because the name of the company in the e-mail is the same
company name in an invoice showing they purchased the drawing
from NASC.

Critical Technology.  Other U.S. requests for this document shall be referred to Puget Sound Naval Shipyard and Intermediate Maintenance Facility, Boston Detachment."  The document also contains the following warning statement, "WARNING – This document contains technical data whose export is restricted by the Arms Export Control Act (Title 22 U.S.C. Sec 2841 et seq.) or the Export Administration Act of 1979, as amended , Title 50 U.S.C. App 2401, et seq. Violations of these export laws are subject to severe criminal penalties. Disseminate per the provisions of OPNAVINST 5510.161.."  Based on my investigation in this case, I do not believe FITTING had authority to access, share, or sell drawing number 5749831.

53.  On December 8, 2018, ERICE's Gmail account emailed MIRABAL: "Dean, Drawing 5749831 is available but I cannot send it because the drawing has 2 sheets and sheet 2 is not available…Also, part number 5749831-007 is not listed on Sheet 1…Regards, Melony"

54.  On December 10, 2018, MIRABAL emailed the NASC customer: "This drawing is not available for the reason. Drawing 5749831 is available but I cannot send it because the drawing has 2 sheets and sheet 2 is not available… Also, part number 5749831-007 is not listed on Sheet 1"  The NASC customer responded: "Dean, You can send what you have and consider drawing order complete…Thanks, Frank"

55.  Shortly after receiving the customer's response, MIRABAL emailed ERICE's Gmail account: "Melony, Can you just send me what you have."

56. MIRABAL sent a follow-up email on December 14, 2018: "Melony, Any luck."

57. On December 16, 2018, ERICE's Gmail account emailed MIRABAL: "Dean, Yes. I can send sheet 1… Drawing 5749831 is a Naval Sea Systems Command Drawing CAGE 53711. The nomenclature is CABLE ASSEMBLY RAMP SYSTEM LANDING CRAFT AIR CUSHION. It is marked "Export Controlled". Please re-confirm and I will send it"

58. On December 17, 2018, MIRABAL responded, "Please send."

59. On December 19, 2018, ERICE's Gmail account emailed MIRABAL: "Dean, The following drawings were sent yesterday 12/18/18. FedEx tracking # 812084953566. You should receive them Friday…" The email listed seventeen drawings, including 5749831 sheet 1.

   a. FedEx records revealed that FedEx Tracking Number 812084953566 was sent by "MELONY GRU8CE" from the company "ME ASSOCIATES" at the address "2388 Hepwell (sic) Rd. Berlin, NJ." Based on my review of Google Maps data, I am aware that the FedEx pickup location is approximately 11.5 miles from FITTING's residence. The FedEx package was sent to "GEOREGE (sic) POSEY" at NASC's business address in Newport Beach, California (SUBJECT PREMISES 1) and was received by "D. MARABAL" on December 20, 2018.

60. On December 20, 2018, MIRABAL emailed the NASC customer: "Frank, Attached is your invoice and drawing…" The email contained an invoice from NASC referencing drawing number

5749831 at a cost of $325, and an attached PDF containing
drawing number 5749831.

61.  During their review of NASC's bank records, agents
found a check made payable from NASC to ERICE dated December 20,
2018, in the amount of $5,025, that was sent to FITTING's
residence.  The check was signed by POSEY IV.  The check was
deposited into ERICE's Bank of America account on March 4, 2019,
at an ATM located in Berlin, New Jersey.

62.  Between March 4, 2019 and March 11, 2019, there were
approximately $4,080 in cash withdrawals from ERICE's Bank of
America account ending 7869 from ATMs located in Berlin, New
Jersey.  During that same period, approximately $930 was
transferred from ERICE's Bank of America account ending 7869,
into which the check was deposited, to a separate Bank of
America account ending 3697 held in ERICE's name, into which
ERICE receives her work-related income from Daher Socata.  Based
on my knowledge of their agreement to split proceeds from NASC
as discussed above, I believe that FITTING collected $4,080 of
the proceeds and ERICE received $930.

3.  Additional Sales

63.  Based on my review of email correspondence and
financial records, I believe that between September 21, 2012,
and June 20, 2019, FITTING and ERICE together unlawfully sold
NASC at least 5,000 government-controlled technical manuals and
drawings.  In exchange for the drawings and manuals, NASC issued
ERICE more than 150 checks, totaling more than $500,000, as
payment.

### I.   Identification of SUBJECT PREMISES 1

64.   The checks NASC paid to ERICE list the address for SUBJECT PREMISES 1 under NASC's name on the checks.   The signature lines included in MIRABAL and POSEY IV's NASC e-mails list NASC's address as SUBJECT PREMISES 1.   I reviewed business records from the California Secretary of State and learned that NASC operates at SUBJECT PREMISES 1.   I also reviewed FedEx records that show FITTING and/or ERICE have shipped packages from New Jersey to SUBJECT PREMISES 1.

65.   Agents conducted surveillance in the vicinity of SUBJECT PREMISES 1 on four occasions between August 12 and 20, 2020.   During the periods of surveillance, agents saw a male matching the physical appearance of, and believed to be, MIRABAL arrive at and enter SUBJECT PREMISES 1.   DMV records reveal that MIRABAL arrived in a vehicle registered to him.   Relevant events from the surveillance are as follows:

a.   Agents began surveillance of SUBJECT PREMISES 1 on August 12, 2020, at approximately 9:30 a.m.   Agents saw MIRABAL's vehicle parked near SUBJECT PREMISES 1 until surveillance was terminated at approximately 11:30 a.m.

b.   On August 13, 2020, at approximately 7:20 a.m., agents saw MIRABAL exit his residence in Costa Mesa, California and enter his vehicle.   Around 7:40 a.m., MIRABAL arrived at SUBJECT PREMISES 1.   MIRABAL's vehicle remained parked near SUBJECT PREMISES 1 until surveillance was terminated at approximately 11:30 a.m.

c.   On August 19, 2020, at approximately 07:21 a.m., agents again saw MIRABAL exit his residence and enter the vehicle that is registered to him.  Around 7:39 a.m., MIRABAL arrived at SUBJECT PREMISES 1.  MIRABAL's vehicle remained parked near SUBJECT PREMISES 1 until surveillance was terminated at approximately 11:00 a.m.

d.   On August 20, 2020, at approximately 07:35 a.m., agents saw MIRABAL approach, appear to unlock, and enter SUBJECT PREMISES 1.  Agents also saw MIRABAL's vehicle, which remained parked near SUBJECT PREMISES 1 until surveillance was terminated at approximately 9:30 a.m.

66.  Based on the periods of surveillance and my knowledge of this investigation, I believe that MIRABAL works for NASC at SUBJECT PREMISES 1.

67.  Agents did not see POSEY IV in the vicinity of SUBJECT PREMISES 1 during the periods of surveillance.

**J.   Evidence, Fruits, and Instrumentalities of the Subject Offenses Will be Found at SUBJECT PREMISES 1**

68.  Prior to receiving information pursuant to the NASC email warrant, on December 6, 2019, I sent Microsoft, Inc. a preservation letter requesting that information associated with the relevant NASC email addresses be preserved pursuant to 18 U.S.C. § 2703(f).  In response, a Microsoft employee informed me, in pertinent part, of the following: The Enterprise data covered by this request is owned and controlled by the customer. The customer is solely in control of the administrator account which allows the customer to retrieve information more quickly

and efficiently than Microsoft. The customer will accordingly have the ability to disclose data to comply with lawful requests.

      a.   I believe that when Microsoft, Inc. references the customer, they are referring to NASC.  Further, agents reviewed documents from Microsoft, Inc. that reflect the billing address for NASC is SUBJECT PREMISES 1.  Accordingly, I believe that, amongst other things, evidence demonstrating use and control of the email accounts described herein will be located at SUBJECT PREMISES 1.

69.  As discussed above, financial records list SUBJECT PREMISES 1 as the address of record for NASC.  Accordingly, I believe that, amongst other things, financial records evidencing payments for the stolen government-controlled technical drawings and manuals described herein will be located at SUBJECT PREMISES 1.

    **K.**    **Identification of SUBJECT PREMISES 2**

70.  Agents reviewed a uniform residential loan application indicating that POSEY IV purchased SUBJECT PREMISES 2 in approximately August 2017.

71.  Agents conducted surveillance in the vicinity of SUBJECT PREMISES 2 on four occasions between August 12 and 20, 2020.  During the periods of surveillance, agents saw two vehicles parked outside of SUBJECT PREMISES 2.  DMV records reflect that one of the vehicles is registered to "George M. Posey" at SUBJECT PREMISES 2 and the other is registered to "George M. Posey or NASC" at SUBJECT PREMISES 1.  Agents also

saw a male matching the physical appearance of, and believed to be, POSEY IV leaving the residence in the mornings, consistent with a resident.   Relevant events from the surveillance are as follows:

      a.   On August 12, 2020, agents saw POSEY IV leave SUBJECT PREMISES 2 at approximately 9:40 a.m. dressed in beach attire.   POSEY IV drove away in the direction of the beach.

      b.   On August 13, 2020, agents saw POSEY IV leave SUBJECT PREMISES 2 at approximately 9:30 a.m.

72.   On August 19, 2020, agents saw POSEY IV leave SUBJECT PREMISES 2 at approximately 9:00 a.m.

      a.   On August 20, 2020, saw POSEY IV leave SUBJECT PREMISES 2 at approximately 7:30 a.m.

73.   Based on the surveillance, and the lack of his presence at SUBJECT PREMISES 1, agents do not believe that POSEY IV has a regular schedule to arrive and work at NASC.   Agents are aware that many companies are offering their employees additional telework opportunities due to the COVID-19 pandemic and suspect that POSEY IV may be working remotely in light of the circumstances.   Regardless of the purpose, as described further below, agents believe that POSEY IV regularly performs NASC business from outside of the office, including from SUBJECT PREMISES 2.

**L.   POSEY IV Performs NASC Business Outside of the Office**

74.   Agents reviewed several e-mails showing POSEY IV conducts NASC business using an iPhone, often from outside of the NASC office (SUBJECT PREMISES 1), including from his home

(SUBJECT PREMISES 2).  The following are examples of such emails:

       a.   On November 9, 2017, at 11:35am, POSEY IV sent an e-mail to accounting@newportaero.com, the subject line stated, "Re: Bills to pay attached".  POSEY IV said, "Release them all besides Melony. Leave that one on my desk.  Please print a new against report for Dean…"  Below POSEY IV's signature line it stated, "Sent from my iPhone".

       b.   On December 13, 2019, at 9:08am, POSEY IV forwarded an e-mail to MIRABAL.  Below POSEY IV's signature line it stated, "Sent from my iPhone".

       c.   On December 23, 2019, at 8:20pm., POSEY IV forwarded an e-mail to MIRABAL.  Below POSEY IV's signature line it stated, "Sent from my iPhone".

       d.   On December 24, 2019, at 2:19pm , in reply to a NASC customer seeking a Technical Order, POSEY IV replied, "Fishing in Cabo, let me live…I'll be back in the office on Thursday."  Below POSEY IV's signature line it stated, "Sent from my iPhone".

       e.   On December 27, 2019, at 5:18am, POSEY IV forwarded an e-mail to MIRABAL, and said, "Is this in stock?" Below POSEY IV's signature line it stated, "Sent from my iPhone".

       f.   On January 22, 2020, at 10:47am, POSEY IV responded to an NASC customer who had inquired about the process if they opted to order technical manuals from NASC.  POSEY IV said, "Hi Ty, I am pretty sure you guys have terms with us.  I'm

working from home this am and don't have QBs available.  We also accept credit card.  Let me know how you would like to proceed. I can email the CMM [Component Maintenance Manual] with a PO or credit card payment…"

   g.   On January 30, 2020 at 2:48pm, POSEY IV sent an e-mail to accounting@newportaero.com, the subject line stated, "Re: I left checks to deposit, checks to mail out, payroll checks and W-2 forms for you and George in my inbox in your office – also, printer in my office is out of black ink".  Below POSEY IV's signature line it stated, "Sent from my iPhone".

   75.   Based on my review of NASC emails and my investigation in this case, I believe that POSEY IV conducts NASC business using an iPhone, often from outside of the NASC office (SUBJECT PREMISES 1), including from his home (SUBJECT PREMISES 2). Accordingly, I believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found at SUBJECT PREMISES 2.

   **M.   Evidence of Continued Criminal Conduct**

   76.   Agents reviewed bank records and discovered that NASC issued a check to ERICE, dated May 8, 2020, in the amount of $6,925.  The check listed ERICE's name and FITTING's address in the memo line, and was signed by POSEY IV.  The check was deposited on May 21, 2020, at a Bank of America ATM in Berlin, New Jersey.  Between May 22 and 26, 2020, cash withdrawals totaling $5,000 were made from ERICE's Bank of America account at ATMs in Berlin, New Jersey.  The financial activity in ERICE's other Bank of America account suggest ERICE was in

Florida at the same time the financial transactions were taking place in Berlin, New Jersey.

77. On August 12, 2020, the Honorable Karen L. Stevenson, United States Magistrate Judge, in case number 2:20-MJ-03792, issued an order pursuant to 18 U.S.C. § 2703(d) directing Google LLC to provide certain non-content records associated with ERICE's Gmail account, to include header information showing source and destination email addresses sent to or from her account. During a review of the information obtained from Google LLC pursuant to that order, agents discovered continued emails between ERICE's Gmail account, FITTING's Navy email account, POSEY IV, and MIRABAL. For example, on July 31, 2020, FITTING's Navy email account e-mailed ERICE's Gmail account. That same day, ERICE's Gmail account e-mailed POSEY IV and MIRABAL. On August 12, 2020, ERICE's Gmail account received an email from FITTING's Navy email account and multiple emails from MIRABAL. ERICE's Gmail account also e-mailed MIRABAL multiple times that day.

78. The non-content records also included the IP addresses used to access ERICE's Gmail account. During a review of those IP addresses, agents discovered that FITTING and ERICE both continue to access ERICE's Gmail account. For instance, on August 10, 2020, an IP address (2601:589:4480:560:9947:b460:d08c:dda3) that iplocation.com geolocates to Pompano Beach, Florida, accessed ERICE's Gmail account using an iPad. Within two minutes of that access, the IP address associated with FITTING's Verizon account

(96.248.93.35 -- discussed above), accessed the account using an Android device.  That same IP address also accessed ERICE's Gmail account multiple times on August 12, 2020.

79.  Based on my review of recent email correspondence between FITTING, ERICE, POSEY IV, and MIRABAL, the non-content records associated with ERICE's Gmail account, and my investigation in this case, I believe that FITTING, ERICE, POSEY IV, and MIRABAL continue to engage in the unlawful procurement of controlled technical drawings and manuals.  Based on the recent periods of surveillance described above, the recent emails between ERICE's Gmail account and POSEY IV and MIRABAL, and my investigation in this case, I believe that evidence, fruits, and instrumentalities of the Subject Offenses with be found with SUBJECT PREMISES 1 and SUBJECT PREMISES 2.

**N.   NASC Unlawfully Obtains Government-Controlled Technical Drawings and Manuals from Additional Sources**

80.  Agents further believe that NASC unlawfully acquires government-controlled technical drawings and/or manuals from sources other than ERICE and FITTING.  In particular, during their review of NASC emails described above, agents identified a Yahoo email account, mroadvisor@yahoo.com (the "Yahoo Supplier"),[10] that appears to be used to email NASC Air Force

---

[10] On August 19, 2020, the Honorable Michael R. Wilner, United States Magistrate Judge, Central District of California, in case number 2:20-MJ-03792, issued an order pursuant to 18 U.S.C. § 2703(d) directing Oath Holdings Inc. (Yahoo) to provide certain non-content records associated with the yahoo email account mroadvisor@yahoo.com.  Agents have not yet received such information.

technical orders ("TOs").  TOs are government-controlled
technical manuals.

81.  For example, on February 3, 2015, POSEY IV e-mailed
the Yahoo Supplier: "Mandy, Dean informed me you may have access
to TOs.  Can you please elaborate on what you have available?
Delivery and cost? Thank you".

82.  That same day, responding to POSEY IV's email, the
Yahoo Supplier replied: Hi Mac, Thank you for your interest.  I
have direct access to the Air Force Portal to which I get the
absolute latest revisions to T.O.'s!! I GUARANTEE you the latest
revision sent electronically at the time of request once it is
not a restricted one!..95 for oh/ipl 80 for o/h only 50 for ipl
only...Give me a try!! Hope to hear from you soon. Mandy".

83.  I reviewed PayPal records for PayPal accounts
belonging to NASC/POSEY IV and the Yahoo Supplier.  On July 2,
2020, a PayPal account associated with the POSEY IV email
account (mac@newportaero.com)[11] transferred $830 to the PayPal
account associated with the Yahoo Supplier.  Based on my
investigation in this case, I believe that the payment was for
the sale of government-controlled technical drawings and/or
manuals.

84.  Based on my review of email correspondence and
financial records, I believe that between February 2015 and July
2020, the Yahoo Supplier sold NASC at least 870 government-

---

[11] The address of record associated with the PayPal account
is SUBJECT PREMISES 1.

controlled technical drawings or manuals.  In exchange, NASC
paid the Yahoo Supplier at least $82,825.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[12]

85.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been

---

[12] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, email, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

     86.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

87.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MIRABAL or POSEY IV's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MIRABAL or POSEY IV's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    88.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.  <u>CONCLUSION</u>

    89.  For all the reasons described above, there is probable cause to believe that FITTING, ERICE, MIRABAL, and POSEY IV have

committed a violation of Title 18, United States Code, Sections
641, 2(a) (Theft of Government Property; Aiding and Abetting).

90.  Further, there is probable cause to believe that the
items listed in Attachment B, which constitute evidence, fruits,
and instrumentalities of violations of the Subject Offenses will
be found in the SUBJECT PREMISES, as described in Attachments A-
1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _28th_ day of
_August_ , 2020.

UNITED STATES MAGISTRATE JUDGE